WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Theresa Mary Dungee, | No. CV-13-00481-TUC-CRP |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security | |
| Defendant. | |

Plaintiff Theresa Mary Dungee has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).  Pending before the Court are Plaintiff's Opening Brief (Doc. 18) ("Plaintiff's Brief") and Defendant's Memorandum in Support of the Commissioner's Decision (Doc. 21).  For the following reasons, the Court remands this matter for an immediate award of benefits.

**BACKGROUND**

Dungee, who was born on July 2, 1958, is a high school graduate and has completed two years of college courses.  (Administrative Record ("AR.") 276, 283).  She is married and has no minor children.  (AR. 129).  Her past relevant work, from about

1996 through 2004, was as an oral surgery dental assistant and dental assistant property tech.  (*See* AR. 322).  Dungee alleges that she has been unable to work since December 24, 2004 due to "fibromyalgia, chronic fatigue, carpal tunnel[,] depression[,] hypertension, upper gastrointestinal."  (AR. 304-05).  Dungee asserts that she became unable to work due to fatigue, "pain all over my body", low back pain, pain in the neck and shoulder area, fogginess making it difficult to concentrate, the inability "to function all day in a work environment, standing, sitting, holding things.  I drop things…" because of "carpel tunnel in both hands."  (AR. 131, 154-55))

In December 2009, Sandoval protectively filed an application for disability insurance benefits under the Social Security Act.  (AR. 276-77).  The application was denied on initial review and again on reconsideration, after which Dungee requested that her claim be heard by an administrative law judge.  (AR. 227-30, 233-35, 237).  A hearing was held on July 6, 2011 before Administrative Law Judge Norman R. Buls ("ALJ") at which Dungee, who was represented by counsel, was the only witness to testify. (AR. 149-67, 253-55).  The ALJ found that although Dungee suffered from severe fibromyalgia and carpal tunnel syndrome, she was able to perform her past relevant work as a medical assistant and that she was, therefore, not disabled.  (AR. 206-14).  However, the Appeals Council vacated the decision for the reasons that the opinion evidence of record did not support the ALJ's "determination that claimant's depression is a nonsevere impairment…" and because the decision did not contain an evaluation of examining Dr. Rothbaum's opinion indicating that Dungee's "impairments would preclude the performance of full-time work."  (AR. 221-22).  Upon remand, a second hearing was held at which Dungee who was represented by counsel, and Vocational Expert Bonnie Drumwight ("VE") testified.  (AR. 126-48).  On September 4, 2012, the ALJ issued his decision finding Dungee was not disabled under the Social Security Act.  (AR. 22-31).  Thereafter, the Appeals Council denied Dungee's request for review, thus rendering the ALJ's September 4, 2012 Decision the final decision of the Commissioner.  (AR. 1-6, 17, 396-403).

Dungee then initiated the instant action, arguing that: (1) the ALJ failed to provide legally sufficient reasons for granting reduced weight to the physical function opinions of treating physicians Powers and Thomas, "and in disregarding the directive of the Appeals Council by again ignoring the physical function opinions of examining internist Rothbaum"; (2) the ALJ failed "to acknowledge the mental functional assessments of treating psychiatrist Sullivan and examining psychologist Tromp, and in claiming to credit but ultimately ignoring significant aspects of the assessment of examining psychologist Rafindadi"; and (3) the ALJ's credibility finding was not based on legally sufficient rationales and was not supported by substantial evidence. (Plaintiff's Brief, p. 2).

Defendant contends that the ALJ's decision is supported by substantial evidence of record.

**THE MEDICAL RECORD**

In October 2004, Dungee presented to treating rheumatologist Deborah Power, D.O., with complaints that she had not been feeling well for the last six months. (AR. 522). She felt hot and cold, she had severe pain in the neck, she had decreased energy, and she was not sleeping well in that after falling asleep, she would wake and not be able to fall back to sleep. (*Id.*). She would stay in bed three to four days, then feel better for a couple of weeks, only to have the symptoms return. (*Id.*). Antidepressants did not help, but Ultram helped with pain. (*Id.*). She also reported that she had been previously diagnosed with carpel tunnel syndrome. (*Id.*). At this time, she was taking Zoloft, Zantac, Estrodol, Allegra, and Motrin. (*Id.*). On examination, Dr. Power found no tender points, noted palpable muscle spasm in the left anterior and mid scalenes, tension in the upper trapezii, and rounded shoulders. (AR. 523). She also noted that Dungee presented with tearful affect. (*Id.*). Dr. Power diagnosed neck pain, carpel tunnel syndrome ("CTS"), disordered sleep, and fatigue. (AR. 524). She prescribed Trazodone and Ultram and referred Dungee to physical therapy for CTS and neck pain. (*Id.*).

In December 2004, Dungee followed up with Dr. Power with continued

complaints of severe pain and aching all over.  (AR. 515-16).  Although Ultram helped with the pain, the symptoms were now occurring on a weekly basis.  (*Id.*).  Dungee also experienced tingling in the arms and at the top of her head.  (*Id.*).  On exam, Dr. Power found palpable muscle spasms, tension in the bilateral upper trapezius, tenderness of cervical paraspinals, flat/tearful affect, and no myofascial tender points.  (AR. 515-16). Dr. Power noted that Dungee's fatigue was of an unclear etiology.  (AR. 516).  Dr. Power diagnosed neck pain, disordered sleep, and fatigue, and placed Dungee on a trial of Neurontin.  (*Id.*).

In July 2006, Dungee presented with complaints of fatigue to Douglas Peterson, M.D., of the Mayo Clinic, to whom she "self–referred".  (AR. 427-30).  "She just has a general sense of no energy.  If she tries to exercise much she can spend as much as 3-4 days in bed with just a sense of not feeling well and having no energy….She does have some pain, but it is primarily in joints in the hands, elbows, and hips.  That is fairly constant and it has been present over the last 2 years.  There is no hot, red, swollen joint." (AR. 427).  She also reported fairly constant tingling in her hands and decreased grip strength necessitating assistance from her husband in opening jars.  (*Id.* (Dungee also reported that she has been diagnosed with CTS and has tried wrist splints)).  She experiences right-sided headaches and tingling in her ankles.  (*Id.*).  She had gained about 10 pounds in the last 2 years.  (AR. 428).  "She is not exercising because of no energy. Prior to 2 years ago she did aerobic exercise and lifted weights to total about an hour most days."  (*Id.*).  Musculoskeletal exam was negative.  (AR. 429).  Dr. Peterson's impression included "[f]atigue, probably multifactorial" and bilateral CTS.  (*Id.*).

In September 2006, Dungee saw rheumatologist James Posever, who practices with Dr. Power, with continued complaints of chronic fatigue and flu-like symptoms. (AR. 509 ("whole body aches muscles/joints/bones")).  He found fullness at the PIP joints bilaterally as well as irregular cardiac rhythm.  (AR.510).  His assessment included arthritis, NOS; sicca[1]; and fatigue.  (AR. 511).

---

[1] Sicca, also referred to as Sjogren's syndrome, involves "dryness of mucous

The record reflects that in January 2007, Suzette Avetian, D.O., refilled Dungee's prescriptions for Tramadol, Sertraline. (AR. 598-99 (Dungee complained of chest pain)). In April 2007, Dungee returned to Dr. Avetian for treatment of a pulled muscle in her upper chest area and she also reported that she "feels terrible" and experiences joint pain "all over". (AR. 448-49). Exam revealed that Dungee experienced pain that flowed in line of the sternocleidomastoid muscle to the chest wall insertion with right rotation of her head. (AR. 449). She had normal movement of all extremities. (*Id.*). Dr. Avetian administered injections to Dungee's neck and shoulders. (AR. 450). In May 2007, Dungee presented to Dr. Avetian requesting referral to Dr. Helm for fibromyalgia. (AR. 445). Dr. Avetian assessed depression and made a referral for myalgia and myositis. (AR. 445-56). Dungee was taking Ultram for pain and Dr. Avetian continued Tramadol and Sertraline. (AR. 446).

On May 14, 2007, Dungee presented to family and pain medicine physician Kyla Helm, M.D., with complaints of "having 'all over pain' about 2 years ago. No specific inciting event. Pain initially started in hands bilaterally and left throat; she has never been given the diagnosis of FM [fibromyalgia]….She is trying to exercise on a regular basis but this causes a lot of post exertional pain." (AR. 732). Dungee also reported that she had been experiencing depression for the last 2 years along with the onset of her pain condition. (*Id.*). Dr. Helm found that Dungee's musculoskeletal exam was "[a]bnormal. Diffusely tender throughout Fibromyaliga Tender Points: 10/18." (*Id.*). Her assessment was depression and fibromyalgia. (*Id.*).

Dungee returned to Dr. Posever on May 18, 2007, reporting fatigue and "myalgias: can't do much for any length of time." (AR. 506). She also complained of joint stiffness, which was at its worst in the morning. (*Id.*). On examination, Dr. Posever noted fluid in the PIP and MTP joints of the ankles. (AR. 507). His assessment included

---

membranes, telangiectasias or purpuric spots on the face, and bilateral parotoid enlargement, seen in menopausal women, and often associated with rheumatoid arthritis, Raynaud's phenomenon, and dental caries…." *Stedman's Medical Dictionary,* p. 1741(26th ed. 1995);

arthritis, NOS; sicca; fatigue; and fibromyalgia as a "prior d[iagnosis]." (*Id*).  In August, 2007 Dungee complained of increased fatigue, her sleep was not restorative, and that she had a dull ache in her joints and they were stiff and "walking—anything aches afterwards". (AR. 504).  Dr. Posever, assessed arthritis; sicca; fibromyalgia; and vitamin D deficiency. (AR. 505).  He started Dungee on Hydroxychloroquine, which is generic for Plaquenil, used for treatment of, *inter alia,* rheumatoid arthritis. (*Id.*; *see also* Plaintiff's Brief, p. 12, & n.2).

Also in August 2007, Dungee, who is left-handed, presented to orthopaedic surgeon Joseph Sheppard, M.D., for complaints associated with CTS. (AR. 129, 671). Dr. Sheppard noted Dungee's report of a prior diagnosis of CTS[2]. (AR. 671).  He diagnosed triggering, right middle, ring and small fingers; and bilateral carpel tunnel syndrome. (*Id.*).  An October 2007 EMG/NCV showed findings consistent with bilateral carpel tunnel syndrome, slightly worse on the right. (AR. 770-71).

In October 2007, Dungee told Dr. Posever that her joints remained painful, her muscles and bones ached diffusely, and that she was chronically fatigued. (AR. 502). Examination revealed Dungee was positive for tender points of fibromyalgia. (AR. 503). Lab work revealed increased ANA[3]. (AR. 466).  Dr. Posever's assessment included arthritis; sicca; increased amylase; and fibromyalgia. (AR. 503).

In December 2007, Dr. Sheppard performed a carpel tunnel release on Dungee's right hand, in addition to releases and tenosynovectomies of the tendons of the fingers of the right hand. (AR. 778-79).  In January 2008, Dungee presented with restricted motion

---

[2] A 2003 EMG/NCV study showed "[f]ar advanced carpal tunnel syndrome bilaterally with marked motor and sensory slowing across the wrist in both median nerves…." (AR. 799).  A 2006 NCV of the right lower limb was normal, but the EMG showed bilateral median neuropathies of both wrists, of moderate severity, worse on the right  (AR. 439-40).

[3] "Antinuclear antibodies (ANAs) are antibodies that have the capability of binding to certain structures within the nucleus of the cells.  ANAs are found in patients whose immune system may be predisposed to cause inflammation against their own body tissues.  The propensity for the immune system to work against its own body is referred to as autoimmunity.  ANAs indicate the possible presence of autoimmunity and provide an indication for doctors to consider the possibility of autoimmune illness." (Plaintiff's Brief, p. 12 n. 1 (citation omitted)).

of the fingers in her right hand. (AR. 760). In February 2008, Dr. Sheppard performed a second procedure—a tenolysis of the fingers of the right hand—because of contractures in those fingers secondary to the development of adhesions. (AR. 759, 765-66). By late March 2008, Dungee's range of motion was found to be gradually improving, and she was advised to continue with physical therapy. (AR. 754; 895-901 (physical therapy notes)).

In February 2008, Dungee presented to internist Jerome Rothbaum, M.D., for consultative examination related to her application for benefits. (AR. 741-47 (Dr. Rothbaum indicated that he reviewed the medical record and x-rays in conjunction with assessment)). Dungee, reported taking Tramadol one hour before the examination. (AR. 743). Dr. Rothbaum found no tenderness over the frontal areas of the maxilla. (*Id.*). "She is tender over the medial trapezii bilaterally, the anterior upper thorax on the right only, over the sacroiliac areas. She does not display tenderness over the cervical area, the elbows, the knees. It may very well be that the Tramadol has modified what would otherwise be a response." (*Id.*). He also noted that her grip strength was 5/5 and that when squatting, she was limited by stiffness involving the entire lower extremity. (*Id.*). His impression included fibromyalgia/chronic fatigue syndrome, noting that "[t]he lack of appropriate number of trigger points might be attributed to the recent use of Tramadol"; bilateral CTS; status-post right carpal tunnel release; status-post release trigger fingers three, four, five, right hand; history of mitral valve prolapse; and depression/anxiety. (AR. 744). He opined that Dungee could occasionally lift and carry up to 20 pounds and frequently lift and carry less than 10 pounds; she was limited to standing and walking at least 4 to 5 hours, and she could sit without limitation. (AR. 745). While Dungee could never climb ladders, ropes or scaffolds, she could occasionally: climb ramps and stairs; stoop, kneel, crouch, crawl, reach, handle, finger and feel. (AR. 746). She should not work around extreme noises, chemicals, dust/fumes or gases, or excessive noise. (*Id.*). Dr. Rothbaum further stated:

The claimant does suffer from severe fatigue and cannot complete an eight

- 7 -

hour day or a 40 hour work week.  This is due to fibromyalgia/chronic fatigue syndrome.  Clinically she would conform to this diagnosis and we would expect these limitations.

(*Id.*).  A March 2008 treatment note[4] reflects Dungee's statement that Lyrica was helping.  (AR. 931).  However, she continued to complain of interrupted sleep, fatigue, and widespread pain.  (*Id.*).  Dungee exhibited 18/18 tender points for fibromyalgia.  (AR. 932).  Assessment was fibromyalgia, positive ANA, and depression.  (AR. 933) She was continued on Zoloft and Ultram and Lyrica was increased.  (*Id.*).

On March 6, 2008, Dungee was examined by psychologist Machelle Martinez, Ph.D., with regard to her application for benefits.  (AR. 748-49).  Dr. Martinez diagnosed depressive disorder, NOS and opined that: "[a]ttention and concentration were good and memory grossly intact.  She reports mild symptoms of depression related to symptom of reported fibromyalgia.  If awarded, she appears capable of managing benefits independently."  (AR. 749).

In August 2008, Dungee reported to Dr. Berchman that the increased Lyrica dosage was helping but she experienced heart palpations and swollen hands and feet, so she reduced the dosage and was now tolerating it.  (AR. 929).  Dungee complained of increased fatigue and morning stiffness.  (*Id.*).

In September 2008, Dungee requested a referral to a neurologist for evaluation of her fibromyalgia.  (AR. 1088).  Also in November 2008, Dr. Avetian by telephone referred Dungee to the emergency room with complaints that she could not move her legs.  (AR. 1068).  Initially, her legs were heavy and painful, later she became able to slowly move them.  (*Id.*).  The record reflects that Dungee's medications for fibromyalgia were refilled through the end of 2008.  (AR. 1088, 1470).

In December 2008, Dungee presented to psychiatrist William Sullivan, M.D., for

---

[4] The provider's signature on this treatment note from University Physicians is difficult to read.  Defendant contends the note is from Dr. Power (Defendant's Brief, p. 3).  Dungee states the note is from Dr. Vaz Berchman.  (Plaintiff's Brief, p. 13).  An August 21, 2008 note from Dr. Berchman, also of University Physicians, suggests the provider was Dr. Swe.  (AR. 929).

follow up from a November 20, 2008 visit.  (AR. 1215).  She reported that crying spells and thoughts of suicide had ceased, however, she "does not enjoy things."  (AR. 1215).  Dr. Sullivan noted that Dungee was cooperative with a full range of affect and her mood was improved.  (*Id.*).  He continued her on Cymbalta, and Adderall and added Abilify.  (*Id.*).  He diagnosed depressive disorder).  (*Id.*).

In January 2009, Dungee saw Wallace Rumsey, M.D., at R.W. Bliss Army Hospital, for complaints of severe pain in her lower neck/trapezius area radiating up the neck, for which there was no inciting incident.  (AR. 1059).  Dungee held her head in a midline position for comfort.  (*Id.*).  Upon examination, Dungee's neck was spastic and markedly tender, "also levator scapulae tender in…it's [sic] origin."  (AR. 1060).  He diagnosed trapezoid muscle strain on the right and administered trigger point injections.  (*Id.*).

In February 2009, Dungee returned to Dr. Power complaining of dropping things, diffuse myalgias, numbness of the left side of her face and left upper extremity, pain all over her neck and upper back, joint swelling which was better with Lyrica, and fatigue improving with Adderall.  (AR. 784).  "[I]f she over exerts will be in bed for a couple of days."  (*Id.*).  On examination Dr. Power found

> Cervical spine: trapezius tightness, bilaterally with palable [sic] muscle spasms bilaterally, tenderness occipital region.  Hands: no synovitis, bilaterally.  Thoracic spine: paired trigger points, increased muscle tension bilaterally.  Lumbar spine:  SI joint tenderness, paraspinal muscle tension.  Hips:  bilateral trochanteric bursitis.  Fibromyalgia tender points all 18+ tenderness in the upper and lower extremities.  [A]ll other joints are normal without synovitis and with normal ranges of motions.  No deformities noted.

(AR. 785 (also noting "On examination, she has all 18 of the American College of Rheumatology tender points consistent with Fibromyalgia.")).  Dr. Power's assessment included fibromyalgia; arthralgias; spasm of muscle; and fatigue.  (*Id.*).  She referred Dungee for aquatic therapy for chronic spasm and muscle tightness in the upper trapezius.  (AR. 786).

In February 2009, Dungee reported to Dr. Sullivan that her mood dipped in the afternoon. (AR. 1215).  He discontinued Abilify and increased Adderall.  (*Id.*).

In March 2009, Dungee presented to John LaWall, M.D., to determine whether she had multiple sclerosis, which he ruled out based on review of Dungee's history, and MRI and physical exam.  (AR. 788-89, 1454-55).

During March, April and June of 2009, Dungee attended physical therapy for her neck and mid-back cervicalgia and thoracic spine pain.  (AR. 874-94).  Although Dungee felt better for most of the day after her sessions, the pain and stiffness would return by the evening.  (*See* AR. 875-94; *see also* AR. 875 (April 21, 2009)).  Also in April 2009 Dungee reported to Dr. Sullivan that medication was helping and her pain was "75% less."  (AR. 1214).  In June 2009, Dungee reported to Dr. Sullivan that her mood was improved and pool therapy was helping her fibromyalgia symptoms.  (AR. 1213).  She continued on Cymbalta and Adderall in addition to taking Ultram and Zantac.  (*Id.*).

In September 2009, Dungee reported to Theresa Biron, FNP[5], at R.W. Bliss Army Hospital, that she had a flare up in her neck and upper back despite taking Cymbalta and Ultram.  (AR. 1023-25).  On exam, Dungee's cervical spine "showed abnormalities. Moves very slowly with upper back muscles.  Has limited neck range of motion with discomfort."  (AR. 1025).  Her thoracic spine showed abnormalities, as well, although NP Biron did not provide specifics.  (*Id.*).  NP Biron assessed myalgia and myositis and prescribed Diazepam and Oxycodone.  (*Id.*).

In November 2009, Dungee reported to NP Biron that she was experiencing back pain.  (AR. 1012).  She was taking 3-4 Tramadol and it was not helping.  (*Id.*).  She asked for Balcofen because it is effective for her sister, who also had fibromyalgia.  (*Id.*).  NP Biron prescribed Balcofen.  (*Id.*).

By December 2009, Dungee reported to Dr. Sullivan that she was "[n]ot doing quite as well.  Energy peters out."  (AR. 1213).  He also noted her "[m]ood is improved."

---

[5] Dungee refers to Biron as a doctor (*see e.g.,* Plaintiff's Brief, pp. 8-9), however, correspondence from Dr. Carey indicates Biron is a nurse practitioner.  (*See* AR. 1625).

(*Id.*).  He increased Adderall.  (*Id.*).

On January 6, 2010, Dungee presented to the ER complaining of severe low back pain, was diagnosed with low back spasm and was prescribed Vicodin, Motrin (800 mg), and Omnicef.  (AR. 821-24, *see also* AR. 981).  Dungee returned to Dr. Rumsey complaining of a flare up of her fibromyalgia "causing her moderate discomfort—particularly in lower back-neck…."  (AR. 991).  On exam, Dungee's "[l]umbar/lumbosacral spine exhibited abnormalities has a jump sign with palpation of l-s spine—no arm fibro points on this exam, no knee + hip nape of neck-."  (AR. 991).  He prescribed Vicodin.  (*Id.*).  Dungee reported to NP Biron on January 13, 2010, complaining of back pain from mid-back to tail bone.  (AR. 981).  Dungee exhibited limited range of motion in all directions.  (AR. 982).  Her back was not tender to palpation on examination.  (*Id.*).  NP Biron ordered physical therapy and x-rays which showed minor osteophytic changes at L3-4, consistent with mild osteopenia and normal thoracic spine.  (*Id.*, AR. 976, 1732).

From February 2010 through April 2010, Dungee presented for psychical therapy during which time her symptoms fluctuated.  (AR. 1098-1117).  On March 30, 2010, she reported she had gone bike riding a few days before and was experiencing severe pain in her lower back radiating to both legs.  (AR. 1182).  NP Biron prescribed Hydrocodone and ordered an x-ray which showed bulging disc at L3-4.  (*Id.;* AR. 1734 (moderately bulging anteriorly and mildly bulging posteriorly)).

In March 2010, Dungee reported to psychiatrist Dr. Sullivan she was "[s]leeping well.  Adderall helps with energy, staying awake.  Is exercising and getting PT.  Pain has worsened and her mood has dipped.  Wants to try something else."  (AR. 1212).  On exam, her "[m]ood is worse."  (*Id.*).  Cymbalta was discontinued and Savella was prescribed instead.  (*Id.*).

On April 28, 2010, Dungee was examined by Dr. Suarez for purposes of her application for benefits.  (AR. 1127-32).  On examination, Dungee had normal range of motion of shoulders, elbows, wrists, hips, knees and ankles.  (AR. 1128).  She had no

swelling of the ankles and her handgrips were normal.  (*Id.*).  Dr. Suarez' impression was: history of fibromyalgia, noting "[s]he appears to be responding to the medications and the symptoms are mainly subjective."; depression, noting "[s]he appears to be responding to the medication because today she is very talkative.  There are no signs of depression."; CTS, noting "[b]asically, she responded to the surgery of the right hand because there are no objective findings of the disease."; and "[h]ypertension in basically good control with the medication."  (AR. 1129).  He opined that Dungee could return to her work as a medical assistant "because her subjective problems will not limit her in that job."  (*Id.*).  He further opined that Dungee could occasionally lift and carry up to 50 pounds and frequently lift and carry 25 pounds.  (AR. 1130).  She was unlimited in standing, walking and sitting and she could: frequently climb ramps, ladders, ropes, scaffolds or stairs; stoop, kneel, crouch, crawl, reach, handle, finger, and feel.  (AR. 1130-1).

On June 24, 2010, treating rheumatologist Dr. Powers opined that Dungee could: sit 3-4 hours per day and stand or walk 1-2 hours.  (AR. 1205).  Furthermore, Dungee could not continuously sit and should "get up and move around" every 45-60 minutes. (*Id.*).  Dungee could frequently lift and carry up to 5 pounds.  (*Id.*).  Dungee is only capable of low stress jobs and would require unscheduled breaks of about 15-20 minutes throughout the day.  (AR. 1205-06).  Dungee has "good days" and "bad days" and would be expected to miss work more than 3 times a month.  (AR. 1206).  Dungee would need to avoid pushing, pulling, kneeling, bending, stooping, heights, humidity, as well as temperature extremes.  (AR. 1206-07).  To support her opinion, Dr. Power cited her length of treatment, that Dungee exhibited 18 out of 18 tender points consistent with fibromyalgia, examinations which revealed muscle spasm and increased muscle tension, and Dungee's complaints.  (AR. 1202-07).

In August 2010, NP Biron administered an injection for Dungee's complaints of headache lasting over a week.  (AR. 1691-92).  In September 2010, NP Biron refilled Dungee's medication for fibromyalgia and back pain.  (AR. 1687).  Dungee also

1    requested a referral to neurology for back pain.  (*Id.*).

2         On May 1, 2010, psychologist Karlaye Rafindadi, Ph.D., rendered his opinion
3    upon consultative examination of Dungee in connection with her application for
4    disability benefits.  (AR. 1118-25).  Dungee reported:

> Experiencing chronic pain and extreme fatigue as a result of Fibromyalgia
> and Chronic Fatigue Syndrome.  She first began to experience body aches
> and fatigue in 2004 and this was followed by cognitive "fogginess".  She
> was constantly tired and her employers were unsympathetic.  She reports
> receiving a diagnosis of Fibromyalgia and Chronic Fatigue Syndrome in
> 2006 and is currently managing her symptoms via medication therapy.  She
> reports some relief, but continues to experience poor concentration and
> focus.

(AR. 1121).  In describing her daily activities, she stated that she took breaks throughout
the day due to fatigue.  (*Id.*).  She also reported "a history of psychiatric hospitalization
and outpatient health services since 2004.  She was admitted to [the hospital]…in 2004
after experiencing extreme fatigue, physical pain, depressive symptomology and suicidal
ideation."  (AR. 1122).  In 2008, she began treatment with Dr. Sullivan who has
prescribed Cymbalta, Abilify and Adderall.  (*Id.*).  Dr. Rafindadi diagnosed:  Depressive
Disorder NOS; and Fibromyalgia, Chronic Fatigue Syndrome, Carpal Tunnel.  (AR.
1122).  He indicated that "[p]sychosocial stressors are primarily the result of chronic
pain; [u]nemployment."  (*Id.*).  He assessed a Global Assessment of Functioning Score of
60.  (*Id.*).  Dr. Rafindadi's clinical findings included:

> [M]edical ailments have led to depressive symptomology, currently well
> managed via medication therapy.  Although the MMSE suggests "mild
> cognitive impairment", she was found to be alert and fully oriented during
> the present assessment.  She struggled with attention and concentration
> tasks and required prompting to complete 3 step instructions.  Recent
> memory was fair and remote memory intact.  She responded will to inquiry
> and made an effort to respond fully to questions posed during the
> assessment.  If granted benefits, she is capable of managing them
> independently in her own best interest.

(AR. 1123).  Dr. Rafindadi completed a Psychological/Psychiatric Medical Source
Statement indicating that Dungee's condition resulted in several limitations.  (AR. 1124).

According to Dr. Rafindadi, Dungee "is able to understand and remember very simple instructions.  She may experience some difficulty remembering locations but is capable of remembering work-like procedures.  This is evidenced by her struggle to recall 3 step instructions during the current assessment.  Immediate recall was intact, but delayed recall was fair as she was only able to recall 2/3 objects after five minutes.  Remote memory appears intact as she is capable of recalling major events in her life." (*Id.*).  As to sustained concentration and pace, Dr. Rafindadi found that

> Ms. Dungee was able to adequately sustained [sic] attention through the present assessment for the duration of 1 hour.  However she struggled with tasks that required attention and concentration.  She was able to carry out simple 2-step instructions without assistance, but she required prompting to carry out 3-step instructions.  Her ability to perform within a schedule, maintain regular attendance and be punctual may be compromised due to subjective perception of pain.  She is capable of sustaining an ordinary routine without supervision and she is capable of working in proximity of others without being distracted.  However, she may struggle to make simple work related decisions as she tends to loose [sic] focus and attention.  Her ability to complete a normal workday or workweek is also compromised as a result of subjective feelings of pain and physical discomfort.

(*Id.*).  Dr. Rafindadi opined that Dungee was unlimited with regard to social interaction and was aware of normal hazards, able to set realistic goals, travel and  use public transportation. (*Id.*).  However, "[s]he may struggle with changes in the work setting, as evidenced by her struggle to adjust to changes during the present assessment." (*Id.*).

On October 11, 2010, Dungee presented to neurologist Guy Cary, M.D., on referral from NP Biron.  (AR. 1625-28).  Dungee reported to Dr. Cary that she experienced "radiating neck pain and axial low back pain, both of apparent spontaneous onset…[S]he describes a current 10/10 intensity 'aching sharp' pain in the mid low cervical region, which can radiate down either upper limb, and a nonradiating midline low lumbosacral pain.  Symptoms can be triggered or exacerbated by walking, standing, or bending from the waist.  It can be relieved by lying down on her side.  Medications tried have included Ultram and Motrin.  She currently takes Vicodin." (AR. 1625).  Dungee informed Dr. Carey she had tried physical therapy and was currently using a

TENS unit for her low back.  (*Id.*).  Examination revealed "spasm throughout the paraspinal musculature.  Multiple tender points are palpated on the posterior thoracic face."  (AR. 1627).  Dr. Cary's impression was: irritative cervical radiculopathy; lumbar pain; myofascial pain syndrome; and fibromyalgia.  (*Id.*).  He recommended home exercises, further rheumatology work-up for the fibromyalgia, using the TENS unit on the neck as well as low back, pool therapy, topical pain-relieving patch, and he preferred that Dungee's opioid medication be refilled by her primary care provider.  (AR. 1628).

In May 2010, Dungee fell onto her knees resulting in pain and soreness and difficulty walking.  (AR. 1155-56, 1161).  X-rays revealed left knee within normal limits.  (AR. 1155-56).  On October 15, 2010, Dungee presented to Rosemarie Thomas, M.D., at R.W. Bliss Army Hospital, requesting a refill of Vicodin for knee pain persisting after her fall that previous May.  (AR. 1621-23).

In May 2010, non-examining state agency physician, John  Fahlberg, M.D., concluded that Dungee can perform medium work.  (AR. 179-80).  On September 20, 2010, non-examining state agency psychologist, Randall Garland, Ph.D., concluded that Dungee could understand and remember simple tasks, sustain concentration for simple tasks, and perform low-stress work allowing. (AR. 194-95).

October 2010 x-rays revealed C5-6 and C6-7disc spaces are moderately severely narrowed.  (AR. 1616).

On November 1, 2010, Dungee presented to pain management specialist Emil Annabi, M.D., for pain in her neck, back and leg that she rated 10/10 with which "she is unable to cope...at times."  (AR. 1221-22).  Dr. Annabi noted that "[h]er cervical films did show degenerative disc disease and foraminal stenosis however this was a plain x-ray of the cervical spine.  Her MRI of the lumbar spine...showed L3-4 disc bulge...."  (AR. 1222).  Dungee indicated that she was using a TENS unit and doing pool therapy in addition to her medications.  (*Id.*).  On physical exam, Dr. Annabi noted decreased range of motion flexion extension of both cervical and lumbar spine as well as positive Spurling's maneuver and negative sitting SLR.  (*Id.*).  On December 2, 2010, Dr. Annabi

administered epidural injections.  (AR. 1217-20).

Records from late 2010 through 2011 reflect Dungee received various medication refills, primarily prescribed by Thomas for complaints of pain, mainly associated with back and left knee pain  (*See e.g.* AR. 1168-69, 1555, 1568-69, 1608, 1871, 1881-82, 1885-57, 1894, 1904, 1910, 1915, 1928).  In April 2011, Dungee requested additional refills of Vicodin because of a pending trip for several weeks to see her ill mother in Michigan. (AR. 1549).  She also planned to arrange for a lumbar steroid injection before she left.  (*Id.*; *see also* AR. 1541 (Dungee also requested a referral to a pain clinic in Michigan for treatment)).

Additionally, on December 8, 2011, Dungee was diagnosed with tendonitis and and iliac crest spur with lower back pain.  (AR. 1865; *see also* AR. 1856 (Dr. Thomas finding posterior superior and inferior iliac crest tenderness on examination)).

Refills of medication for back pain, hip pain, and fibromyalgia symptoms continued into 2012.  (AR. 1762-63, 1750, 1784-86).

In March 2012, Dr. Thomas completed a Multiple Impairment Questionnaire indicating her diagnosis of fibromyalgia, and that Dungee could sit, stand and/or walk for 0-1 hours in an 8-hour day, she was markedly limited in the use of: her right and left fingers and her hands for fine manipulation; her arms for reaching; and her left hand for grasping, twisting and turning. (AR. 1748-49, 1752).  Dr. Thomas opined that Dungee's condition interfered with her ability to keep her neck in one position and she was incapable of even low stress jobs:  "prior to onset of fibromyalgia [patient] could tolerate stress—now even low stress increases pain." (AR. 1751).  Dungee could occasionally lift and carry up to 10 pounds and she could not push, pull, kneel, bend or stoop.  (AR. 1751-52).  Dr. Thomas stated that "persistent activity exacerbates pain." (AR. 1752).

In May 2012, Dr. Sullivan, Dungee's treating psychiatrist completed a Psychiatric/Psychological Impairment Questionnaire.  (AR. 1960-67).  Although Dr. Sullivan noted Dungee was not limited in several areas, he indicated that she was: markedly limited in the ability to complete a normal workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; and mildly limited in the ability to maintain attention and concentration for extended periods.  .(AR. 1963-65).  As clinical findings, he cited mood disturbance and decreased energy.  (AR. 1961).

In June 2012, psychologist Sharon Tromp, Ph.D., examined Dungee upon request of Dungee's counsel for purposes of the application for benefits.   (AR. 1968-81). Dungee reported having good days and bad days. (AR. 1976).   She reported concentration problems due to pain.  (*Id.*).  Testing revealed delayed recall, borderline delayed memory, and inability to continue with testing due to pain after a couple of hours even with breaks and the ability to change positions and move around.  (AR. 1981). Testing also indicated Dungee "can manage simple and some detailed tasks, but memory for even simple things will become impaired as she fatigues.  Thus, she will have trouble with anything beyond rote, overlearned tasks once she begins to fatigue."  (*Id.*).  Her endurance on the day of the examination suggested "that she may fatigue considerably after a couple of hours."  (*Id.*).

According to Dr. Tromp, while Dungee may have no limitation in certain areas, after approximately two hours, she will become moderately to markedly limited with abilities such as remembering new information relating to locations and work-like procedures and understanding and remembering one or two-step instructions with regard to new information.  (AR. 1971; *see id.* (If there is no new information, then Dungee would have no limitation)).   After two hours, she will become moderately limited in the ability to carry out simple one or two-step instructions.  (AR. 1971).  She is markedly limited in the abilities to: carry out and maintain concentration with regard to detailed instructions;   maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; and complete a normal workweek without interruptions from psychologically based symptoms; and

perform at a consistent pace without an unreasonable number and length of rest periods; and travel to unfamiliar places or use public transportation.  (AR. 1971-73).  She is mildly limited in the abilities to: respond appropriately to changes in the work setting and set realistic goals or  make plans independently of others. (*Id.*).  According to Dr. Tromp, Dungee's "pain [and] fatigue will lower stress tolerance, coping, adaptability, and ability to perform work related tasks over time."  (AR. 1973).

**STANDARD**

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).  The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.   Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at 1098 (*citing Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).   Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"   *Tackett,* 180 F.3d at 1098 (*quoting Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)).

- 18 -

1 Rather, the Court must "'consider the record as a whole, weighing both evidence that
2 supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting*
3 *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

4 SSA regulations require the ALJ to evaluate disability claims pursuant to a five-
5 step sequential process. 20 C.F.R. §404.1520. To establish disability, the claimant must
6 show she has not worked since the alleged disability onset date, she has a severe
7 impairment, and her impairment meets or equals a listed impairment or her residual
8 functional capacity ("RFC")[1] precludes her from performing past work. Where the
9 claimant meets her burden, the Commissioner must show that the claimant is able to
10 perform other work, which requires consideration of the claimant's RFC to perform other
11 substantial gainful work in the national economy in view of claimant's age, education,
12 and work experience.

13 **THE ALJ'S FINDINGS IN PERTINENT PART**

14 The ALJ found that Dungee had not engaged in substantial gainful activity from
15 her alleged onset date of December 24, 2004, through her date last insured of March 31,
16 2010. (AR. 124) He found that Dungee had the following severe impairments: history
17 of fibromyalgia, carpal tunnel syndrome, and depression. (*Id.*). He determined that
18 Dungee's impairments did not meet or equal a listing. (*Id.*). He determined that Dungee
19 has the RFC:

20 To perform medium work as defined in 20 C.F.R. § 1567(c) except that
21 claimant is limited to understanding and remembering work-like
   procedures. Although the claimant has difficulty with three step
22 instructions, the claimant is able to perform two-step instructions without
23 assistance. The claimant requires prompting to carry out three step
   instructions. The claimant is able to sustain attention for periods of one
24 hour at a time. The claimant is able to sustain an ordinary routine without
25 supervision. The claimant is able to work in proximity to others without
   being distracted by them. The claimant is able to interact appropriately
26 with the general public. The claimant is able to ask simple questions,

27
───────────────
28 [1]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R.
§§ 404.1545, 416.945.

respond to questions appropriately and request assistance.  The claimant is able to be aware of normal hazards and take precautions.  The claimant is able to set realistic goals and make plans independently of others.  The claimant is able to travel in unfamiliar places and use public transportation.  The claimant struggles with changes in the work setting.

(AR. 26).  The ALJ further determined that Dungee could not perform her past relevant work.  (AR. 30).  Based on testimony of the VE, the ALJ concluded that Dungee could perform other work which exists in significant numbers in the national economy such as a conveyor feeder/off loader, *Dictionary of Occupational Titles* ("DOT") No. 921.860-014; cook/helper, DOT No. 317.687-010; or dining room attendant, DOT No. 311-677-018. (AR. 30-31).  Therefore, the ALJ found that Dungee has not been under a disability as defined in the Social Security Act from December 24, 2004 through March 31, 2010, the date last insured. (AR. 31).

**DISCUSSION**

**INTRODUCTION.**  The ALJ found that Dungee suffered from the severe impairments of history of fibromyalgia, carpal tunnel syndrome, and depression.

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (citations omitted).  Common symptoms of fibromyalgia, which Dungee also experiences, include chronic diffuse pain throughout the body; multiple tender points; sensitivity to stress and activity level; chronic fatigue; sleep disturbance; stiffness; cognitive or memory problems; and depression.  *Id.* at 589-590; *Willis v. Callahan*, 979 F.Supp. 1299, 1303 n. 2 (D. Or. 1997); *see also* SSR 12-2p, 2012 WL 3104769, *3 (referring to cognitive or memory problems associated with fibromyalgia as "fribro fog")).  "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community."  *Benecke, 379 F.3d at 590.  See also Sarchet v. Chater,* 78 F.3d 305. 306 (7th Cir. 1996) (fibromyalgia is "a common, but elusive and mysterious disease...").  "'There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and the only symptom that discriminates between it and other

diseases of a rheumatic character multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Rollins v. Massanari,* 261 F.3d 853, 855 (9th Cir. 2001) (quoting *Sarchet,* 78 F.3d at 306) (internal quotation marks omitted); *see also* SSR 12-2p, 2012 WL 3104769.  The Ninth Circuit has observed that fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms."  *Benecke*, 379 F.3d at 590

As set out above, in addition to seeking treatment for fibromyalgia, Dungee also underwent surgery for CTS, and has also sought psychiatric treatment.

**CREDIBILITY.**  When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted).  However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptom(s), and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing.  *Garrison v. Colvin,* 759 F.3d 995, 1014 (9th Cir. 2014); *see also Burrell v. Colvin,* 775 F.3d at 1133, 1137 (9th Cir. 2014) (reaffirming the "clear and convincing" standard)).  "'The clear and convincing standard is the most demanding standard required in Social Security cases.'"  *Garrison,* 759 F.3d at 1015 (quoting *Moore v. Commissioner of Social Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)) (internal quotation marks omitted).

To satisfy the "clear and convincing" standard, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn*, 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive).  In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the

claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Id.*; *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Robbins v. Social Security Admin.*, 466 F.3d 880, 884 (9th Cir. 2006). The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison,* 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen,* 80 F.3d. at 1287 n.7 (citations omitted). The Ninth Circuit recently observed:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must in fact constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

Here, the ALJ stated "that the record supports a finding that the claimant's pain is

subjective in nature." (AR. 29). Yet, the law is clear that once the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged, as the ALJ found Dungee did, the claimant is not required to "produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison,* 759 F.3d at 1014 (quoting *Smolen,* 80 F.3d at 1282). The ALJ noted Dungee's testimony that "her impairments cause her to suffer pain, fatigue and fogginess in thinking that [sic] inability to concentrate to such an extent that she is unable to work. The claimant also testified that her medications make her sleepy, which also interferes with her ability to work." (AR. 27). He went on to state that although Dungee's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the symptoms were "not credible to the extent they are inconsistent with…" the RFC. (AR. 27). Elsewhere in his decision, when discussing limitations assessed by treating Drs. Power and Thomas, the ALJ gave Dungee's testimony "no weight" with regard to alleged limitations regarding fine and gross manipulation given Dungee's activities of daily living, and limitations regarding her ability to sit and stand given Dungee's ability to care for her household or pet or travel for great distances. (AR. 29-30).

Dungee argues that the ALJ's first statement discounting her credibility was "in the form of boilerplate language…" that fails to satisfy the ALJ's burden. (Plaintiff's Brief, p. 33). Additionally, Dungee contends that the ALJ's reasons, stated later his opinion, are not clear and convincing. (*Id.* at pp. 34-35).

At the outset, a plain reading of the ALJ's decision supports the conclusion that the ALJ divided assessment of Dungee's credibility into two categories: her statements and activities concerning the limiting effect of her mental impairments and statements and activities concerning the limiting effect of her "physical" impairments. In doing so, the ALJ overlooks the fact pointed out by the majority of treating doctors and examining Drs. Rafindadi and Tromp, case law and SSR 12-2p, that symptoms of fibromyalgia

1    contribute to, or factor into, Dungee's assessed mental limitations.

2         To the extent the ALJ uses boilerplate language in finding Dungee's testimony

3    regarding the severity of her symptoms of pain, fatigue, fogginess, and inability to

4    concentrate, the Seventh Circuit Court of Appeals explains, the manner in which this

5    "boilerplate language" is used in the Commissioner's credibility analysis "gets things

6    backwards." *Bjornson*, 671 F.3d at 645 (the "problem is that the assessment of a

7    claimant's ability to work will often … depend heavily on the credibility of her

8    statements concerning the 'intensity, persistence and limiting effects' of her symptoms,

9    but the passage implies that ability to work is determined first and is then used to

10   determine the claimant's credibility."). The ALJ's opinion that Dungee  statements were

11   not credible to the extent they are inconsistent with the RFC  yields no clue as to what

12   weight the ALJ gave that testimony, and "fails to inform us in a meaningful, reviewable

13   way of the specific evidence the ALJ considered in determining that claimant's

14   complaints were not credible." *Id.* (citations omitted); *see also Treichler v. Commissioner*

15   *of Soc. Security,* 775 F.3d at 1090, (9th Cir. 2014) (accord).

16        The mere use of the boilerplate language is not generally a cause for remand if the

17   ALJ's conclusion is followed by sufficient reasoning, *see e.g. Jones v. Commissioner of*

18   *Soc. Sec.*, 2012 WL 6184941, * 4 (D.Or. Dec. 11, 2012)(boilerplate language is a

19   conclusion which may be affirmed if the ALJ's stated reasons for rejecting the plaintiff's

20   testimony are clear and convincing); *Bowers v. Astrue*, 2012 WL 2401642, *9 (D.Or.

21   June 25, 2012)(concluding that this language erroneously reverses the analysis, but

22   finding such error harmless because the ALJ cited other clear and convincing reasons for

23   rejecting the claimant's testimony); *cf. Treichler,* 775 F.3d at 1103 (acknowledging that

24   "[a]fter making this boilerplate statement, the ALJs typically identify what parts of the

25   claimant's testimony were not credible."). However, here, the ALJ cited no reasons

26   whatsoever for rejecting in any portion of Dungee's testimony that she suffers pain,

27   fatigue and fogginess in thinking and inability to concentrate to such an extent that she is

28   unable to work or that her medications make her sleepy. As such, the ALJ has failed to

set out clear and convincing reasons for rejecting Dungee's credibility on this topic to the extent that it is inconsistent with the ALJ's RFC assessment.  *See e.g. Treichler,* 775 F.3d at 1102 ("we require the ALJ to 'specifically identify the testimony [from a claimant] she or he finds to be not credible and…explain what evidence undermines the testimony.'"). (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001)).

The ALJ did set out reasons for discrediting physical assessments by Drs. Power and Thomas:  Dungee's activities of daily living contradicted limitations in ability to engage in fine and gross manipulation and Dungee's ability to care for her household or her pet or travel for great distances contradicted limitations to sit or stand.  (AR. 29-30). Although the ALJ did not specify any specific daily activities upon which he relied, elsewhere in the decision he stated that Dungee "reported that she is able to take care of her pets, engage in light housework, do laundry and perform her self-care activities without assistance."  (AR. 25).  It is unclear how Dungee's apparent abilities to care for her pet dog, engage in light housework and do laundry directly correlate to fine and gross manipulation or the ability to work on any level.[6]  Moreover, as to self-care, Dungee reported that she resorted to cutting her hair short and wearing a wig to avoid injury because she can no longer handle a curling iron, having burned herself on several occasions.  (AR. 1121).  Dungee was clear that her ability to accomplish some household tasks was punctuated with rest periods.  (AR. 156 (during the day Dungee tries "to get some things done around the house, whether it's laundry or dishes, and then I lay down for another hour.  Get up and try doing something else, housework generally.  And it's like that for the rest of the day."); AR. 160 (Dungee takes a break after activity); AR. 749 ("She keeps up with cleaning by completing tasks little by little and resting as needed."); AR. 1121 ("Throughout the day she will take breaks…[lying down] due to extreme fatigue.")).  As for her pet, Dungee testified that she had "a little Yorkie" and she cleans

---

[6] Defendant states that Dungee was able to operate a computer.  (Defendant's Brief, p. 23).  The ALJ did not cite this reason to disbelieve Dungee and the Court cannot affirm on evidence that the ALJ did not discuss.  *See Connet,* 340 F.3d at 874.  Moreover, Dungee testified that she could only use the computer for ten minutes at a time because her of hand numbness and she only uses her index finger to type.  (AR. 165).

up after it and lets it in and out.  (AR. 157, 164).  Finally, the record is clear that before Dungee traveled to see her mother, she took the precaution of obtaining extra medication and she inquired about pain clinics in her mother's area.  (AR. 1541, 1549).  As Dungee points out, "[o]ne single instance of travel over the eight-year period since commencement of her disability, coupled by evidence of having to make special arrangements to accommodate her symptoms both before and during the trip, is not supportive of the notion that her 'travel' is either a regular occurrence or that it undermines her doctors' assessments of her functional capacity."  (Plaintiff's Brief, p. 29).

On the instant record the ALJ has failed to set forth clear and convincing reasons to reject Dungee's credibility.

**THE OPINION EVIDENCE:  STANDARD.**   There are three types of medical opinions (treating, examining, and nonexamining) and each type is accorded different weight. *See Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995); *see also Carmickle v. Commissioner.,* 533 F.3d 1155, 1164 (9th Cir. 2008) ("Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships.").  Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant. *See Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1987).  Medical opinions and conclusions of treating physicians are accorded special weight because treating physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Commissioner of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to 'substantial weight.'"); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) ("We afford greater weight to a treating physician's opinion

because he is employed to cure and has a greater opportunity to know and observe the patient as an individual.")(internal quotation marks and citation omitted); 20 C.F.R §§ 404.1527, 416.927 (generally, more weight is given to treating sources).

An ALJ may reject a treating physician's uncontradicted opinion only after giving "'clear and convincing reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester*, 81 F.3d at 830). "Even if the treating doctor's [medical] opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick*, 157 F.3d at 725 (citing *Lester*, 81 F.3d. at 830). Similarly, the ALJ may reject a treating physician's controverted opinion on the ultimate issue of disability, i.e., the claimant's ability to perform work, only with specific and legitimate reasons supported by substantial evidence in the record. *Id.* (citing *Lester*, 81 F.3d at 830).

"And like the opinion of a treating doctor, the opinion of examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-831.

**EXAMINING DR. RAFINDADI'S OPINION (PSYCHOLOGICAL).** Upon remand from the Appeals Counsel of the ALJ's initial decision denying disability benefits, the ALJ was, *inter alia*, directed to evaluate Dungee's depression. (AR. 221-22 (Appeals Council indicating that evidence of record undermined the ALJ's initial decision that Dungee's depression did not constitute a severe impairment)). On remand, the ALJ determined that Dungee's depression constituted a legally severe impairment. With regard to Dungee's mental impairments, the record contains a report from non-examining psychologist Dr. Garland; reports from examining psychologists Drs. Martinez, Rafindadi, and Tromp; and treatment records and a Psychiatric/Psychological Impairment Questionnaire from treating psychiatrist Dr. Sullivan. Also, examining physician Enrique Suarez, Ph.D., whose specialty is physical medicine, noted his observation regarding Dungee's depression. (AR. 1127, 1129). The ALJ specifically discussed only examining Drs.

1    Martinez', Rafindadi's and Suarez' opinions in his decision.  (AR. 27-29).  The ALJ gave

2    "great weight to…" Dr. Rafindadi's opinion.  (AR. 29).  The ALJ also gave great weight

3    to Dr. Suarez' opinion, although in that portion of his decision doing so, the ALJ was not

4    specifically addressing Dungee's mental impairment.[7]  (*See id.*).

5        Dungee argues that although the ALJ said he accorded great weight to Dr.

6    Rafindadi's opinion, the ALJ nonetheless rejected portions of Dr. Rafindadi's opinion

7    without discussion.  (Plaintiff's Brief, pp. 30-31).  According to Dungee, the ALJ's

8    disregard of significant portions of Dr. Rafindadi's opinion without any stated reason

9    constitutes harmful error.  (*Id.*).

10       Dungee points out that because Dr. Rafindadi's opinion is contradicted by

11   examining psychologist Martinez, Dr. Rafindadi's opinion "can only be validly rejected

12   by reference to 'specific and legitimate' reasons that are supported by substantial

13   evidence in the record."[8]  (Plaintiff's Brief, p. 30 (citing *Andrews v. Shalala,* 53 F.3d

14   1035, 1043 (9th Cir. 1995); *Lester,* 81 F.3d at 830-31).  The ALJ may meet this burden

15   "by setting out a detailed and thorough summary of the facts and conflicting clinical

16   evidence, stating his interpretation thereof, and making findings….The ALJ must do

17   more than offer his conclusions. He must set forth his own interpretations and explain

18   why they, rather than the doctors', are correct." *Orn,* 495 F.3d 632 (citation omitted).

19       As discussed in greater detail above, Dr. Rafindadi opined that Dungee "is able to

20   understand and remember very simple instructions.  She may experience some difficulty

21   remembering locations but is capable of remembering work-like procedures."  (AR.

22   1124)  Dr. Rafindadi also indicated that Dungee "may struggle to make simple work

---

24   [7] Dr. Suarez noted upon his physical examination of Dungee that: "She appears to
     be responding to the medication because today she is very talkative.  There are no signs
25   of depression."  (AR. 1129).

26   [8] Dr. Martinez opined that Dungee's mental impairment was less restrictive than
     Dr. Rafindadi indicated.  (*See* AR. 749 (Dr. Martinez diagnosed Depressive Disorder
27   NOS and found Dungee's "[a]ttention and concentration were good and memory grossly
     intact.  She reports  mild symptoms of depression related to symptoms of reported
     fibromyalgia.").  Although the ALJ summarized Dr. Martinez' findings, he did not
28   indicate what, if any, weight he accorded Dr. Martinez' opinion.  (AR. 27).  Moreover,
     the ALJ was clear that he accorded "great weight" to Dr. Rafindadi's opinion.  (AR. 29).

related decisions as she tends to loose [sic] focus and attention.  Her ability to complete a normal workday or workweek is also compromised as a result of subjective feelings of pain and physical discomfort."  (Id.).

The ALJ gave great weight to Dr. Rafindadi's opinion, stating that the May 2010 "examination was very proximate to the claimant's date last incurred and, accordingly, is very useful for determining the claimant's functional level at that time."  (AR. 29).  He also pointed out that Dr. Rafindadi personally administered several tests during the evaluation "and his opinion concerning [Dungee's] capabilities is consistent with the test results.  The undersigned also notes that the medical evidence of record indicates that the claimant's depression has responded well to treatment."  (Id.).

The ALJ's RFC assessment accounted for many restrictions consistent with Dr. Rafindadi's opinion.  For example, in line with Dr. Rafindadi's opinion, the ALJ limited Dungee "to understanding and remembering simple instructions….Although the claimant has difficulty with three step instructions the claimant is able to perform two-step instructions without assistance.  The claimant requires prompting to carry out three step instructions….The claimant is able to sustain attention for periods of one hour at a time….The claimant struggles with changes in the work setting."  (AR. 26).  However, Dungee points out that the ALJ omitted from the RFC, without discussion, " other mental limitations…" endorsed by Dr. Rafindadi including:  difficulty in remembering locations; a compromised ability to perform activities within a schedule; and a compromised ability to complete a normal workday or workweek.  (AR. 1124; *see also* Plaintiff's Brief, p. 30).

There can be no dispute that the ALJ's decision is completely devoid of any discussion of the Dr. Rafindadi's findings regarding the "other mental limitations" discussed above.  Defendant argues that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities to, on a sustained basis, understand carry out, and remember simple instructions; respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting."

(Defendant's Brief, p. 18 (citing SSR 85-15, 1985 WL 56857; SSR 96-9p, 1996 WL 374185)).  Defendant goes on to point out that the Dr. Rafindadi's limitations that the ALJ chose to include in the RFC assessment addressed Dungee's ability to sustain attention and concentration and tolerate changes in the work setting.  (Defendant's Brief, p. 18).   However, key to the determination is the claimant's ability to work "on a sustained basis", which means "8 hours a day, 5 days a week, or an equivalent work schedule".  SSR 96-9p, 1996 WL 374185, *9.  *See also id.* at *2 ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule.").  Dr. Rafindadi's opinion that Dungee's ability to complete a normal workday or workweek are compromised go to the very heart of the issue whether Dungee can work on a regular and continuing basis.[9]   The ALJ's complete failure to acknowledge and account for this limitation by either accepting it or providing specific and legitimate reasons to discount it was erroneous.

**TREATING DR. SULLIVAN'S OPINION (PSYCHIATRIC).**   The ALJ did not discuss Dr. Sullivan's 2012 Opinion and, therefore, failed to set out specific and legitimate reasons to reject it.  Defendant asserts that Dr. Sullivan did not render his opinion until May 2012,

---

[9] Dr. Rafindadi was not alone in concluding that Dungee was limited in her ability to work on a sustained basis.  Treating psychiatrist Dr. Sullivan, who diagnosed depressive disorder, NOS,  indicated, among other limitations, that Dungee was: markedly limited in the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance.  (AR. 1960, 1963-64).   The ALJ neither mentioned nor evaluated Dr. Sullivan's opinion.  Likewise, examining internist Dr. Rothbaum, also opined that due to fibromyalgia/chronic fatigue, Dungee "cannot complete an eight hour day or a 40 hour work week….Clinically she would conform to this diagnosis and we would expect these limitations."  (AR. 746).  When summarizing Dr. Rothbaum's opinion, the ALJ omitted this point.  Treating rheumatologist Dr. Power was also of the opinion that Dungee would miss work more than three times a month as a result of her fibromyalgia and that she would need to take unscheduled breaks to rest approximately every hour throughout the workday.   (AR. 1206-07).   Likewise, examining psychologist Dr. Tromp was also indicated limitations in this regard.  (AR. 1971-73).

more than two years after Dungee's date last insured and that the objective evidence of record does not support his findings.  (Defendant's Brief, pp. 18-19).

Dr. Sullivan, who has treated Dungee since November 2008, was clear in his 2012 opinion that the assessed limitations dated back to the time of Dungee's first appointment.  (AR. 1967).  Retrospective diagnoses by treating physicians are relevant to the determination of a continuously existing disability with onset prior to expiration of insured status.  *Flaten v. Secretary of Health & Human Servs.,* 44 F.3d 1453, 1461 n. 4 (9th Cir. 1995).    Thus, the fact, alone, that Dr. Sullivan's opinion was made retrospectively is legally insufficient.  *See e.g. Lester,* 81 F.3d at 832.

As to Defendant's argument that Dr. Sullivan's opinion is inconsistent with the objective record, the Social Security Administration has explained that a finding that a treating source medical opinion is not well-supported by medically acceptable evidence or is inconsistent with substantial evidence in the record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected.  *Orn*, 495 F.3d at 632.  Treating source medical opinions are still entitled to deference and, "[i]n many cases,  . . . will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  *Orn*, 495 F.3d at 632; *see also Murray*, 722 F.2d at 502 ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.").

Moreover, the Court disagrees that Dr. Sullivan's findings are inconsistent with the evidence given that treating Dr. Power, and examining Drs. Rothbaum, Rafindadi, and Tromp reached similar conclusions regarding Dungee's restricted ability to perform activities within a schedule, maintain regular attendance, be punctual and to complete a normal workweek without interruptions from her symptoms.

**EXAMINING   DR.   ROTHBAUM'S   OPINION:   FIBROMYALGIA/CARPEL   TUNNEL SYNDROME.**  As discussed above, Dr. Rothbaum essentially limited Dungee to a reduced range of light work (*see* AR. 745-46; Defendant's Brief, p. 14).  However, he went on to

state that, clinically, Dungee would be expected to be unable to complete an 8-hour day or a 40-hour week due to fatigue.  (AR. 746).

Although the ALJ mentioned Dr. Rothbaum's examination and favorable findings such as that Dungee "did not exhibit tender points consistent with fibromyalgia…" and "walked normally and got on and off the examining table normally[]", he did not mention Dr. Rothbaum's statement regarding Dungee's inability to complete an 8-hour workday or a 40-hour workweek.  (AR. 27).

Dungee points out that the Appeals Council remanded the ALJ's initial decision, in part, to "evaluate…" Dr. Rothbaum's opinion and "to explain the weight given to such opinion evidence."  (AR. 222; *see also* Plaintiff's Brief, p. 26).  The regulations require that the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b).  The record is clear that the ALJ did not state what weight, if any, he attributed to Dr. Rothbaum's opinion.  On this point, Dungee stresses that "[t]he ALJ may not escape ramifications of Dr. Rothbaum's opinion by simply—and repeatedly—ignoring it."  (Plaintiff's Brief, p. 26).  The ALJ not only failed to comply with the Appeals Council's mandate and regulations regarding same, but the ALJ also failed to state specific and legitimate reasons for rejecting Dr. Rothbaum's opinion.[10]

The ALJ is clear that he attributed "great weight" to examining Dr. Suarez' opinion, which indicated Dungee was capable of medium work as reflected in the RFC. (AR. 29).  A practical implication, then, is that the ALJ attributed no weight to Dr. Rothbaum's opinion.  To properly rely on Dr. Suarez's opinion as a non-treating physician, the ALJ was obligated to illustrate how those opinions were consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).  The ALJ stated that Dr. Suarez "was able to personally

---

[10] Although the ALJ did not specifically state that he rejected Dr. Rothbaum's opinion, the RFC leads to the conclusion that he did given his determination that Dungee could essentially perform medium work with some mental limitations; whereas Dr. Rothbaum indicated, *inter alia,* that Dungee essentially could perform a limited range of light work and that she would be unable to complete a normal workweek and/or workday.

examine the claimant and review the claimant's medical history[]"[11] and his "examination was closest in time to Dungee's date last insured." (*Id.*). The ALJ found that Dr. Suarez' findings were "consistent with the objective medical evidence of record, which demonstrates minimal, if any, impairments to the claimant's spine or joints. In fact, the undersigned notes that the record supports a finding that the claimant's pain is subjective in nature." (*Id.*).

Although the ALJ found that Dr. Suarez' opinion was "consistent with the objective medical evidence of record which demonstrates minimal, if any, impairments to claimant's spine or joints[]" (AR 29), both Dr. Suarez and the ALJ failed to mention Dungee's bulged disc at L3-4 and narrowed disc space at C5-6 and C6-7. More importantly, there is nothing to suggest that fibromyalgia would manifest by objective "impairments to the claimant's spine or joints". (AR. 29). In fact, there are no lab tests to confirm fibromyalgia. *See Benecke,* 379 F.3d at 589. Examinations of record reflect that Dungee had tender points consistent with fibromyalgia and was tender upon palpation in various areas and exhibited muscle spasm and tightness. However, there is no showing that Dr. Suarez attempted to determine whether Dungee exhibited the tender points on the day of his exam. His report is completely devoid any finding one way or the other. Nor does he indicate whether he examined Dungee for musculoskeletal tenderness. That Dungee exhibited full range of motion on Dr. Suarez' exam does not necessarily negate a finding that she did not have symptoms related to fibromyalgia. Indeed, Dr. Suarez did not deny that Dungee experiences symptoms associated with fibromyalgia. Instead, he dismissed them as "subjective." (AR. 1129 "the symptoms [of fibromyalgia] are mainly subjective.")). Thus, although Dr. Suarez accepted that Dungee experienced "subjective" symptoms related to fibromyalgia, there is no indication that he

---

[11] Dungee argues that Dr. Suarez did not review her medical record and Defendant argues that he did. (Plaintiff's Brief, p. 25; Defendant's Brief, p. 10). It is simply not clear from Dr. Suarez' opinion what information he reviewed, if any, prior to his examination. He does state that Dungee had "[s]ome degree of osteopenia by x-rays[]" (AR. 1128), but that is the only indication that Dr. Suarez considered any medical records or history other than what Dungee told him during the examination, and she may very well have been the source of that information as well.

attempted to assess their impact on her ability to work; whereas, Dr. Rothbaum did.  This distinction severely undermines Dr. Suarez' opinion, especially given that the ALJ provided no reason to reject Dr. Rothbaum's opinion.  Further, that the ALJ later rejected Dungee's credibility does not revive Dr. Suarez' opinion given that, as discussed above, the ALJ's credibility finding cannot stand.

Defendant, in addition to adopting the ALJ's rationale, also states that Dr. Suarez' opinion is consistent with the record in light of non-examining Dr. Fahlberg's opinion that Dungee could perform medium work.  (Defendant's Brief, p. 16).  The ALJ never mentioned Dr. Fahlberg as a reason to support Dr. Suarez or to reject Dr. Rothbaum.  The ALJ did not mention Dr. Falhberg's assessment at all.  That a non-examining doctor later re-iterated Dr. Suarez' findings does not alter the outcome that the ALJ failed to state specific and legitimate reasons supported by substantial evidence of record to reject Dr. Rothbaum's opinion.  The ALJ's failure to set forth specific and legitimate reasons to reject Dr. Rothbaum's opinion was erroneous.

**TREATING DOCTORS POWER AND THOMAS: FIBROMYALGIA.**   The ALJ rejected treating Drs. Power's and Thomas' opinions because

> both opinions concerning the claimant's abilities are based largely on the claimant's subjective complaints and not upon the results of any objective testing.  The limitations espoused are not consistent with the claimant's self-reported activities or her abilities as demonstrated during examinations. For example, the marked limitations alleged in the claimant's ability to engage in fine and gross manipulations are not supported by the claimant's activities of daily living.  The claimant's limitations in her ability to sit or stand are not supported by the claimant's ability to care for her household or her pet, or travel for great distances.

(AR. 29-30).  The Court has set out in great detail above when discussing the medical record objective clinical findings supporting Drs. Power's and Thomas' opinions. Further, it was unreasonable for the ALJ to fault the treating doctors for relying on Dungee's subjective complaints. Dungee's fibromyalgia and depression

> are not impairments which are amenable to objective verification. *See Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987) ('[U]nlike a broken

arm, a mind cannot be x-rayed....'). It is therefore not surprising that [the treating doctors'] assessment[s] relied in part on [Dungee's] subjective reports of fatigue [and other symptoms].

*Delgado v. Astrue,* 2008 WL 828961, *9 (D.Ariz. March 26, 2008) (claimant suffered from fatigue, depression and anxiety). Neither doctor found any indication that Dungee was malingering or deceptive. *See Regginnitter v. Commissioner of the Soc. Sec. Admin.,* 166 F.3d 1294, 1300 (9th Cir. 1998) (rejecting ALJ's dismissal of doctor's reliance on subjective complaints). Moreover, the Court has explained above why the ALJ's rejection of these opinions based on Dungee's activities was erroneous. Consequently, the ALJ has failed to set forth specific and legitimate reasons for rejecting treating Drs. Power's and Thomas' opinions regarding the functional limitations of Dungee's impairments.

**REMAND FOR AN IMMEDIATE AWARD OF BENEFITS**

Dungee requests that the Court credit the improperly rejected evidence as true and remand this matter for an immediate award of benefits. (Plaintiff's Brief, pp. 35). Alternatively, she requests that the matter be remanded for further proceedings before a different ALJ. (*Id.* at pp. 32, 35).

Remand for an award of benefits is appropriate where:

(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted); *see also Benecke,* 379 F.3d at 593(citations omitted). The *Garrison* court also noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Garrison,* 759 at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292); *see also Treichler,* 775 F.3d at 1103 (in evaluating whether further

administrative proceedings would be useful, "we consider whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules.").  Where the test is met, the Ninth Circuit "take[s] the relevant testimony to be established as true and remand[s] for an award of benefits[,]"  *Benecke,* 379 F.3d at 593 (citations omitted), unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  *Garrison,* 795 F.3d at 1021 (citations omitted).

Here, remand for an immediate award of benefits is appropriate.  The record has been fully developed and remand for further administrative proceedings would serve no useful purpose.  Upon remand from the Appeals Council, the ALJ failed to provide legally sufficient reasons to reject opinions from treating Drs. Power, Thomas, and Sullivan and examining Drs. Rothbaum and Rafindadi.  With regard to physical limitations, alone, either Drs. Power's or Thomas' assessment would result in a disability finding given that Dungee would be unable to sustain full-time sedentary work. *See e.g.,* SSR 96-9p, 1996 WL 374185.  Moreover, it is abundantly clear that the ALJ failed to account for repeated and consistent statements indicating that Dungee would be precluded from maintaining a regular schedule.  As Dr. Rothbaum put it: "[Dungee] does suffer from severe fatigue and cannot complete an eight hour day or a 40 hour work week.  This is due to fibromyalgia/chronic fatigue syndrome.  Clinically she would conform to this diagnosis and we would expect these limitations."  (AR. 746).  Dr. Rothbaum's statement is consistent with and supported by the substantial evidence of record.  Crediting Dr. Rothbaum's opinion as true results in the unquestionable conclusion that Dungee is unable to perform sustained work on a regular and continuing basis.  *See* SSR 96-9p, 1996 WL 374185, *2 ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule.").  Consequently, upon consideration of the substantial evidence or record, this Court has no reason for serious

doubt as to whether Dungee is disabled under the Act.

**CONCLUSION**

For the foregoing reasons, this matter is remanded for an immediate award of benefits. Accordingly,

IT IS ORDERED that this action is REMANDED to the Commissioner for an immediate award of benefits.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file in this matter.

Dated this 31st day of March, 2015.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**